# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JODY MAYES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 13-2111-JAR |
| | ) |
| THE STANDARD INSURANCE CO., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

Plaintiff Jody Mayes was employed by CenturyLink as a NTAC II Support Engineer.
She participated in a long-term disability ("LTD") plan, sponsored by CenturyLink and issued by
Defendant The Standard Insurance Company ("Standard").  While out of work in August 2011
on short-term disability due to back pain, Plaintiff suffered a heart attack.  She underwent heart
surgery in September and again in December 2011.  Plaintiff applied for and was denied long-
term disability benefits in 2012.  Plaintiff brings this action against Standard under the Employee
Retirement Income Security Act of 1974 ("ERISA"), seeking judicial review of Standard's
denial of long-term disability benefits.  This matter is before the Court on the parties' cross-
motions for summary judgment (Docs. 32, 35).  As described more fully below, the Court denies
Plaintiff's motion for summary judgment and grants Standard's motion for summary judgment.

## I.    Standards of Review

Summary judgment is appropriate if the moving party demonstrates "that there is no
genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1]

_____

[1]Fed. R. Civ. P. 56(a).

Cross-motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another," but "[t]o the extent the cross-motions overlap . . . the court may address the legal arguments together."[2]

Both parties argue that they are entitled to judgment as a matter of law. ERISA gives Plaintiff, as plan beneficiary, the right to federal court review of the denial of her disability benefits.[3] "[I]n ERISA cases seeking review of a denial of ERISA benefits, the court's review is 'limited to the administrative record,' i.e., the materials compiled by the ERISA plan's administrator in the course of making its decision."[4] This case is governed by the standards applicable to an appeal of an administrative decision, and "the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record."[5]

Plaintiff concedes that the LTD Plan provides discretionary authority to Standard to interpret its terms and conditions as well as to determine eligibility for benefits. Because the Plan gives the administrator discretionary authority, "we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[6] Under this standard, "review is limited to determining whether the interpretation of the plan was reasonable

---

[2]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quotations omitted).

[3]29 U.S.C. § 1132(a)(1)(B).

[4]*Berges*, 704 F. Supp. 2d at 1155 (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (citation omitted)).

[5]*Panther v. Synthes (U.S.A.)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 & n.31 (10th Cir. 1994)).

[6]*Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quotations omitted).

and made in good faith."[7]  The decision of the plan administrator will be upheld "so long as it is predicated on a reasoned basis," and "there is no requirement that the basis relied upon be the only logical one or even the superlative one."[8]  "Consequently, the Tenth Circuit has observed that the arbitrary and capricious standard 'is a difficult one for a claimant to overcome.'"[9]  The Court looks for "substantial evidence" in the record to support the administrator's conclusion, meaning "more than a scintilla" of evidence "that a reasonable mind could accept as sufficient to support a conclusion."[10]  "The substantiality of the evidence must be evaluated 'against the backdrop of the administrative record as a whole.'"[11]

In *Metropolitan Life Insurance Co. v. Glenn*,[12] the Supreme Court held that when an ERISA fiduciary is responsible for determining, in its discretion, eligibility for benefits under an employer-sponsored plan and is also the party responsible for paying claims, a conflict of interest exists.[13]  The Supreme Court held that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and the significance of the factor will depend upon the circumstances of the particular case.[14]  The Supreme Court held that:

---

[7]*Id.* (quotations omitted).

[8]*Id.* at 1134 (quotations omitted).

[9]*Berges*, 704 F. Supp. 2d at 1174 (quoting *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002)).

[10]*Eugene S.*, 663 F.3d at 1134 (quotation omitted).

[11]*Berges*, 704 F. Supp. 2d at 1175 (quotation omitted).

[12]554 U.S. 105 (2008).

[13]*Id.* at 114.

[14]*Id.* at 105.

> The conflict of interest . . . should prove more important (perhaps
> of great importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision, including, but not
> limited to, cases where an insurance company administrator has a
> history of biased claims administration. . . .  It should prove less
> important (perhaps to the vanishing point) where the administrator
> has taken active steps to reduce potential bias and to promote
> accuracy, for example, by walling off claims administrators from
> those interested in firm finances, or by imposing management
> checks that penalize inaccurate decisionmaking irrespective of
> whom the inaccuracy benefits.[15]

The parties agree that Standard acted as both the insurer and administrator of the Plan, but Plaintiff has not presented evidence that Standard has a history of bias or that the provision of benefits under the LTD-Plan had a significant economic impact on Standard.[16]  Although the Court will weigh the dual-role conflict of interest "as a facto[r] in determining whether there is an abuse of discretion,"[17] the Court finds that the conflict should be given limited weight in this case.

## II.   Uncontroverted Facts

Plaintiff Jody Mayes was an employee of CenturyLink beginning in May of 2006, working as a NTAC II Support Engineer.  CenturyLink sponsored an employee welfare benefit plan that provided long-term disability benefits to eligible, qualifying participants who complied with the terms and conditions of that plan ("LTD Plan").  Standard issued the Group Policy Number 643388-D that insured benefits that became payable under the LTD Plan.  Mayes last

---

[15]*Id*. at 117 (citations omitted).

[16]*See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (noting that there is no per se rule of significant economic impact, and that the long term disability costs amounted to a mere .3% of the company's operating expenses for the year); *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1133 (10th Cir. 2011) (stating that a conflict based on generalized economic incentive is insufficient).

[17]*Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (quotation marks and citation omitted).

day of work at CenturyLink was August 4, 2011.  She was a participant in the LTD Plan.

The LTD Plan provides that a participant is "disabled" if he or she meets one of two definitions: (A) Own Occupation of Disability, or (B) Any Occupation of Disability.  Under the "Own Occupation" definition, a participant is disabled if:

> as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:
> 1.   You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
> 2.   You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.[18]

The LTD Plan provides that Standard has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."[19]  The Plan provides that this authority includes the right to

> (a) determine eligibility for insurance;
> (b) entitlement to benefits;
> (c) the amount of benefits payable; and
> (d) the sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.
>
> Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive.  However, this provisions [sic] will not restrict any right you may have to file a lawsuit or contact the Louisiana Insurance Commissioner if your claim for benefits is denied.[20]

If a claim is denied, the LTD Plan provides that the claimant will receive a written notice of the

---

[18]AR at 487.

[19]AR at 500.

[20]AR at 500–01.

denial that includes, *inter alia*, the reasons for the decision, and a description of any additional information needed to support the claim.  If all or part of a claim is denied, the claimant may request a review and may send Standard "written comments or other items to support your claim."[21]

In January 2012, Mayes applied for LTD Plan benefits.  Standard created an administrative record ("AR") regarding Mayes' claim that included all the documents submitted to Standard by Mayes and her physicians, attorney, and employer.  The AR also includes documents Standard otherwise obtained while the claim was pending.

### Medical Records Prior to March 2012

At various times between August 2011 and January 31, 2013, Mayes was examined and treated by neurologist Dr. Harold Hess, pain management physician Dr. Joel Ackerman, infectious disease physician Dr. Himal Bajracharya, vascular surgeon Dr. Prem Samuel, cardiologist Dr. Bernard Levi, cardiologist Dr. Gerald Mancuso, vascular surgeon Dr. Jeffrey Cameron, and primary care physician Dr. Lisa Schnick.  Dr. Schnick is also a personal friend of Mayes.  Medical records from these physicians are included in the AR.  None of these physicians in the medical records state an explicit opinion that Mayes was physically or mentally unable to perform the material and substantial duties of her own occupation and did not impose any restrictions or limitations upon Mayes' activities after January 30, 2012.

Yet, Mayes' physicians made several notations in her medical records about her medical conditions during the period leading up to her LTD claim.  The AR reflects that Mayes underwent lumbar spine surgery in 2008.  Dr. Hess performed the bilateral L4-L5

---

[21]AT at 499.

hemilaminotomy and discectomy.  He treated Mayes on August 11, 2011, noting that despite

doing well after the surgery, she developed pain again in the right buttock radiating down the

right leg to the right foot about one year prior, which had "markedly increased about three weeks

ago."[22]   Dr. Hess noted numbness and weakness in the right leg and after reviewing an MRI

scan, referred Mayes for lumbar epidurals, and to a vascular surgeon for an evaluation because

the MRI reportedly showed an abdominal aneurysm.  Mayes was treated by Dr. Ackerman on

August 24, 2011 and was administered a lumbar epidural.  Dr. Ackerman noted that Mayes

tolerated the procedure well and that she would continue with pain medication at the direction of

her primary care physician.  During the course of his examination, Dr. Ackerman noted that

Mayes' pain was rated between 7/10 and 10/10, and that she was not sleeping well.

Mayes suffered a heart attack, her second, on September 2, 2011.[23]   On September 6, she

underwent a quadruple bypass surgery[24] performed by Dr. Samuel.  Karen Johnson, D.O.

completed a consultation report on September 7, indicating a consultation for diabetes

management during Mayes' hospitalization.  The report indicates that Mayes suffered from new

onset diabetes and was prescribed medication for the condition.

On September 30, Mayes attended a follow-up visit with her primary care physician, Dr.

Schnick.  Dr. Schnick observed that Plaintiff was "feeling pretty good but having a little bit of

memory issues and the first few nights at home was a little unstable.  Much improved now.

She also needs some FMLA papers signed.  No other issues today."  Dr. Schnick also recited

---

[22]AR at 125.

[23]Plaintiff's first heart attack took place in March 2011.

[24]At times, this procedure is referred to in the AR as  coronary artery bypass grafting, or "CABG."

Mayes' medical history, which included her aortic aneurysm, the herniated disc in a new area, and numbness in her right leg.  The progress note explains that Mayes is not a good back surgery candidate yet because of her heart condition.  Mayes also presented with symptoms associated with a tick bite.

Mayes returned to Dr. Ackerman on October 19, 2011 for an epidural steroid injection.  Dr. Ackerman observed symptoms of foot drop, however, Mayes informed Dr. Ackerman that Dr. Hess had ruled out surgical intervention due to her heart condition.

On December 1, 2011, Mayes underwent an abdominal aortic aneurysm repair with aortic stent placement, performed by Dr. Jeffrey Cameron.  Dr. Cameron noted that Mayes "tolerated the procedure well" and that she was "in stable and satisfactory condition" in recovery.[25]

Plaintiff had an appointment with Dr. Schnick on December 13, 2011, to follow-up on her diabetes, and to conduct lab work.  Dr. Schnick noted Mayes' recent surgery and that Mayes was doing "a little bit better" after having abdominal pain.  Mayes asked for a stronger dose of Cymbalta for her chronic back pain, and discussed her continued sleeping problems.  Dr. Schnick noted that her recently-prescribed Ambien caused her to be up "running around," and her husband was worried she could fall and injure herself.  She also noted increased hot flashes since her heart surgery.

Dr. Schnick provided Standard with an Attending Physician's Statement on January 7, 2012, in conjunction with Mayes' LTD claim.  Dr. Schnick relayed Mayes' heart condition and her degenerative bone disease, resulting in a ruptured disc in July 2011 that requires surgery in the "next few months."  Dr. Schnick recommended that Mayes stop working, describing Mayes'

---

[25]AR at 80.

limitations as "Pt. w/ CABG & AAA repair physically weak & [reduced] mental capacity due to O2 deprivation," for sixty to ninety days from the date of the report.[26]  Dr. Schnick recommended continued cardiac rehab until Mayes could undergo back surgery.

Also in January 2012, Mayes was treated by Dr. Ackerman and Dr. Hess.  Dr. Ackerman noted concern with Mayes' foot weakness and that Mayes told him that Dr. Hess did not want to entertain surgery for her back until March 2012, given her heart condition.  Dr. Ackerman recommend follow-up in two months to restart possible lumbar epidural steroid injections.  Dr. Hess presented Mayes with several alternative options to handle her right lumbar radiculopathy. Mayes was to try to see if sitting in a slouched or leaning forward position helps her pain, which would mean she was a candidate for nonsegmental instrumentation and fusion of L3-L4.  The other options would be a decompressive lumbar laminectomy, or a spinal cord stimulator trial. Mayes was to return for a follow-up visit with Dr. Hess one week from January 27, 2012.

On February 8, 2012, Mayes underwent an echocardiogram stress test.  A baseline ECG was recorded and Mayes exercised for almost four minutes "to a maximal work rate of 7 mets. Exercise was terminated due to chest discomfort, dyspnea, fatigue, and dizziness.  Transthoracic stress echocardiography.  Image quality was adequate.  There were no complications."[27]  The test results show that although the target heart rate was not achieved, the heart rate response was normal and Mayes suffered no chest pain.

Mayes followed-up with Dr. Schnick on February 24, 2012 to go over her disability forms.  Mayes reported to Dr. Schnick that she was not feeling well after cardiac rehabilitation,

---

[26]AR at 358.

[27]AR at 269.

that she had increased fatigue, joint pain and muscle aches with occasional tingling in her
extremities, memory issues along with depression, and "significant issues with sleep." Mayes
told Dr. Schnick that she does not feel that she will ever be able to go back to her normal job.
Dr. Schnick reported that Dr. Mancuso does not believe that Mayes' issues were cardiac related
and that Mayes' neurosurgeon has opted to put off back surgery a little bit longer due to Mayes'
other health issues, but that Mayes will "inevitably need something done because the stenosis
and her spine is pretty severe."[28]  Dr. Mancuso noted at a February visit that Mayes has had
trouble working due to her chronic back pain, and that she struggles with low blood pressure and
fatigue.  He noted that the December heart surgery set her back and that she had been "gone for
about a month for recovery."[29]

### Standard's Review of the Medical Evidence

On February 27, 2012, Standard employee Terri Cazee, a nurse case manager, reviewed
Mayes' medical records, including those provided by Dr. Ackerman from August 24, 2011 to
January 11, 2012; Dr. Samuel from September 2, 2011 to October 3, 2011; Dr. Cameron from
August 18, 2011 to January 16, 2012; St. Joseph Medical Center from September 2, 2011 to
September 12, 2011; Dr. Mancuso from October 6, 2011 to February 8, 2012; and from Fort
Scott Hospital from January 28, 2011 to January 16, 2012.  Cazee provided answers to specific
questions regarding Mayes' claim.  She identified the following conditions reported by the
physicians as the source of impairment: a ruptured disc L5-S1 with compression to the S1 nerve
root, foot drop and weakness, two "MI's" resulting in heart surgeries, and "DM" and

---

[28]AR at 60.

[29]AR at 162.

fibromyalgia that are not being treated aggressively.  Cazee opined that the back condition would preclude Mayes from sedentary to light full-time work activity for 21 to 28 days, but that additional medical records were required to further evaluate the impairment.  After Mayes' first heart surgery, Cazee opined that she would be precluded from sedentary to light level work for up to 84 days.  After the December surgery, Cazee opined that Mayes would be precluded from sedentary to light work for 21 to 28 days, or until January 2, 2012.  She based these estimates on MDA Guidelines.  Cazee stated that she was "unable to comment on the recovery of the low back pain," and recommended obtaining medical records from Dr. Hess, Dr. Mancuso, Dr. Younger, a neurologist, and Dr. Schnick.

Dr. Albert Fuchs, who is board certified in internal medicine, provided Standard with a Peer Review Report on Mayes.  In his eight-page report, Dr. Fuchs set forth the medical evidence he reviewed, which included an interview with Mayes' primary care physician, Dr. Schnick on March 27, 2012.  He did not examine Mayes.  Dr. Schnick signed a synopsis of their conversation submitted to her from Dr. Fuchs, indicating that she agreed with his representation of their phone conversation.  She told Dr. Fuchs that the problem that most contributes to Mayes' inability to work is her back pain, which also causes her insomnia and therefore sleep deprivation.  Dr. Schnick further reported to Dr. Fuchs that pain management was difficult with Mayes because she does not tolerate opiate analgesics well.  Dr. Fuchs asked Dr. Schnick about her statement on January 7, 2012 that Mayes suffered from decreased mental capacity due to brain hypoxia during her CABG.  Dr. Fuchs asked if Mayes had been referred for neurocognitive testing to better define this impairment; Dr. Schnick replied that Mayes had not.  She told Dr. Fuchs that "there could be other problems contributing to the patient's inability to work, but that

the above are the only ones of which she is aware."[30]

After reviewing the medical records, reports, MRIs, evaluation reports, and Cazee's report, and after interviewing Dr. Schnick, Dr. Fuchs concluded that Maye's "limitations and restrictions are not supported by the submitted  medical records."[31]  He determined that there is no objective evidence of lingering symptoms attributable to her heart surgeries, nor to her back pain.  Dr. Fuchs explained that Dr. Ackerman as her pain specialist had not escalated her prescribed analgesics, nor had any of the physicians referred Mayes to a sleep specialist.  Dr. Fuchs also dismissed Dr. Schnick's reports of reduced mental capacity, explaining that there is no support that the CABG caused decreased mental capacity other than the notes of subjective complaints to Dr. Schnick.  Dr. Fuchs noted that Mayes' chronic sleep deprivation could be treated more aggressively and yield symptomatic improvement.

***Vocational Evidence***

On March 13, 2012, Steven R. Cooper, Standard's Vocational Case Manager, conducted a job specialty report to determine Mayes' "Own Occupation" as it is currently performed in the general economy.  Cooper reviewed Mayes' statement, the employer's statement, and the job description, and concluded that Mayes' own occupation best resembles the description for an "Electronics Engineer," which required light work strength capacity.  Light work includes:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may be only a negligible amount, a job should be rated Light

---

[30]AR at 47.

[31]AR at 53.

Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing, and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding for a worker even though the amount of force exerted is negligible.[32]

### Standard's Initial Denial

Standard denied Mayes' claim for LTD Plan benefits on April 3, 2012.  The denial letter quoted the LTD Plan's definitions of disability.  Standard determined that Mayes' Own Occupation was that of an Electronics Engineer, which, as performed in the national economy, requires light work strength capacity.  The letter proceeded to evaluate the medical evidence and determined that it did not support the "Own Occupation" definition of disability.  Standard's denial letter explains, in part:

> A thorough review of your medical documentation was conducted by a Physician Consultant.  In his review of the provided medical information, it supports that following both of your surgical procedures (CABG September 6, 2011 and abdominal aortic aneurysm repair on December 1, 2011), a reasonable period of recovery would be required when there would be limitations and restrictions that would preclude you from performing your occupation.  However, there is no indication that there were any complications related to either procedure.
>
> The available medical documentation indicates that you have undergone the above mentioned procedures; however, you would not be precluded from working following these procedures after the Benefit Waiting Period, which ended on January 30, 2012.  Medical records do not support any complications from your procedures that would have precluded you from returning to work.
> **Decision**

---

[32]AR at 455 (reciting the Dep't of Labor Employment and Training Admin., Dictionary of Occupational Titles (4th ed. rev. 1991) [hereinafter "DOT"]).

> Upon review of the medical records from your treating physicians, it is our determination that the available documentation does not show evidence of limitations and restrictions from any physical illness of a severity such that you would be precluded from performing full-time work in your Own Occupation.
>
> As such, your claim has been denied as you do not meet the Own Occupation Definition of Disability under the Group Policy.[33]

On July 1, 2012, Mayes received a notice of disability award from the Social Security Administration upon her initial application, effective starting in February 2012.[34]

Mayes sought review of Standard's denial decision on September 28, 2012. As provided by the Plan, this review was conducted by an independent reviewer separate from the individuals who made the initial claim determination. Mayes submitted the following additional material to Standard: (1) the Social Security Administration award letter; (2) updated medical records; and (3) a transcribed statement from Mayes' primary care physician, Dr. Schnick. Mayes argued that Standard disregarded Dr. Schnick's opinion in making the initial determination, and that limitations imposed by her physicians prevent her from performing either her own occupation, or any occupation. Mayes argued on appeal that Standard failed to consider the severity of her condition, her multiple diagnoses in addition to her cardiac condition, and her multiple medications and the compounding effect they have on her ability to perform the duties of her own occupation.

### Medical Evidence After March 2012

Dr. Ackerman continued to treat Mayes in April, May, and June 2012, noting her persistent pain. He performed epidural steroid injections and discussed with Mayes the

---

[33]AR at 390.

[34]AR at 856–57.

possibility of a spinal cord stimulator as a method of treatment.  Mayes also continued to be

treated by Dr. Schnick.  Dr. Schnick noted during an April 6, 2012 visit that Mayes was upset

about her disability denial and that Mayes felt she could no longer work "at her same potentially

[sic] she did in the past."  Mayes again reported to Dr. Schnick loss of cognitive skills, affecting

her driving and her sleep.  She reported continued back pain, as well as weight gain and

shortness of breath.[35]  In June, Dr. Schnick noted left Achilles pain accompanied by swelling in

the foot and ankle.  Mayes continued to complain to Dr. Schnick of whole-body muscle and joint

pain, memory issues, heartburn, increased weight, and restless leg-type symptoms.[36]

Mayes participated in an overnight sleep study on August 2, 2012, conducted by

pulmonologist Dr. Sidney Devins.  She was diagnosed with mild sleep apnea, after

demonstrating a fragmented sleep pattern.  Dr. Devins further observed "no disturbance from

periodic leg movements."  Dr. Devins recommended overnight treatment with a nasal CPAP

based on the degree of daytime somnolence described by Mayes.

About one week after the sleep study, Mayes was admitted to the hospital for treatment

of an acute arterial occlusion in her right leg.  Dr. Cameron performed surgical revascularization

and extracted a blood clot.  The surgery went well and the hospital notes reflect that Mayes felt

symptom relief.  She was discharged on August 13, 2014.  She followed up with Dr. Cameron on

August 29, 2014, and had her staples removed.  Dr. Cameron noted that she complained of

numbness over the sole of her foot with some mild anterior thigh pain, but stated that her

"surveillance looks very good today. . . .  We will recheck her again in six months.  Sooner

---

[35]AR at 634.

[36]AR at 633.

obviously if necessary."[37]

On September 25, 2012, Mayes' counsel obtained a sworn oral statement from Dr. Schnick by telephone; it was transcribed by a court reporter.[38]  Dr. Schnick was not cross-examined, nor was Defendant present in person or through counsel.  Dr. Schnick discussed Plaintiff's medical history, including her lower back issues for which surgery had been postponed due to her heart surgeries.  Dr. Schnick stated that Mayes' condition had "[d]efinitely deteriorated in just even the past year and a half or so.  Ever since she started having severe back pain, and then subsequently with her cardiac issues, went way downhill after that."[39]  Schnick explained that Mayes was not a candidate for back surgery, despite her severe back issues, "[b]ecause of her extreme deteriorated cardiac condition."  She stated that the neurosurgeon wanted to perform the surgery, but it would be too risky because she could not tolerate the anesthesia.[40]

Dr. Schnick discussed her notations about Mayes' diminished mental capacity and oxygen deprivation: "I said she was physically weak.  She had decreased mental capacity secondary to oxygen deprivation and also sleep deprivation, and, then, pain from her back, so it's kind of multifactorial."  When asked why she did not recommend a mental status exam or a neurocognitive test, Dr. Schnick said she had not

> [b]ecause I've known the patient for several years, as I've already
> stated, and at one of her follow-up visits, her husband was also

---

[37]AR at 588.

[38]AR at 741–62.

[39]AR at 747:2–6.

[40]AR at 749:24–750:4.

> there.  I think I have an office note that may even reference him
> being present at one of the visits.
>
> And he was saying that she gets up in the middle of the
> night, she wanders around, she's not sleeping, she doesn't know
> where she's at. . . . [H]e would have to go try and find her because
> they live kind of out in the country, so he didn't want her to go
> outside where there are animals, and he was, you know, fearful for
> her health because she wasn't really with it.[41]

Dr. Schnick further qualified her conversation with Dr. Fuchs on March 27, 2012.  She stated

that the conversation centered around the conditions for which she treated Mayes, and that she

was not asked questions about Mayes' cardiac condition.

***Standard's Review of the Medical Evidence on Appeal***

In November 2012, Dr. Janette Green, who is board certified in internal medicine,

provided Standard with a second peer review of Mayes' medical records, including the new

records submitted by Mayes.  Dr. Green did not evaluate Mayes in person, but instead reviewed

records from Drs. Schnick, Samuel, Mancuso, Cameron, Ackerman, Johnson, and Hess.  Dr.

Green provided her review and opinion in an eight-page report.  The nurse case manager put

before Dr. Green several questions that she addressed in the report.  She was asked first if the

medical records "support limitations or restrictions due to a combination of the claimant's

multiple medical conditions and medication side effects that would have precluded her from

performing full-time light level work as described above beyond January 31, 2012?  If so,

through what date?"  Dr. Green responded:

> After review of the available medical records, it is reasonable as of
> January 31, 2012, and beyond that the claimant would be
> precluded from light level occupations that require frequent
> standing and walking (primarily due to her chronic back pain and

---

[41]AR at 752:12–753:1.

> aggravated by her multiple other medical conditions).  However,
> documentation does not support that the claimant would be
> precluded from sedentary level or light level occupations that do
> not require frequent standing or walking after January 31, 2012,
> with the exception of a short period of time in August 2012 when
> she was being treated for the stent thrombosis.[42]

Dr. Green was asked to describe Mayes' reasonable limitations and restrictions supported by the

medical records as to her physical abilities during an eight-hour workday.  She replied that her

limitations would preclude medium-level occupations and above, and would preclude her from

"light level occupations that require frequent standing or walking."[43]

Dr. Green was also asked about Mayes' cognitive functions because her "own occupation

requires above average general learning, verbal and numerical abilities, as well as above average

spatial and form perception."  Dr. Green responded that the documentation did not support that

Mayes had cognitive defects that would preclude her from the duties of her own occupation.[44]

***Vocational Evidence on Review***

On January 24, 2013, Karol Paquette prepared a memorandum to Mark Sampson, the

Standard Benefits Review Specialist assigned to Mayes' claim, in response to his request that

she review and comment on the amount of standing and walking required to perform Mayes'

Own Occupation.  Paquette reviewed the employer's statement, Mayes' statement, Mayes' job

description, and the vocational review prepared by Cooper.  She also spoke with a contact at the

CenturyLink office where Mayes worked, and she consulted the LTD Plan definition of Own

Occupation.  Paquette opined that Mayes' Own Occupation continues to be best described as an

---

[42]AR at 516.

[43]*Id.*

[44]*Id.*

"Electronics Engineer" as described by the DOT, a light occupation.  However, when evaluating

the definition of the DOT, she concluded that a number of different jobs within this occupation

may perform duties for specific employers that are not necessarily performed by all employers.

Based on the call with a CenturyLink contact, "the claimant's job was sedentary in nature.  The

claimant was working on the network system to do maintenance to the system and upgrades to

improve functions. . . .  The claimant, and other engineers, performing this work were sitting at a

computer in a cubical for the work shift.  They worked remotely with field technicians that

would be doing the physical upgrades . . . ."[45]

Paquette noted that her CenturyLink contact confirmed that Mayes' Own Occupation was

sedentary and did not involve standing and walking except to go on a break.  He also stated that

he believed Mayes worked remotely from home for awhile.  "As the work is generally performed

in the national economy, it would be reasonable that the claimant could obtain work such as this

in her Own Occupation that would not require frequent standing and walking."[46]

***Standard's Decision on Review***

Standard denied the appeal on January 31, 2013 in a fourteen-page decision, which

considered the additional evidence provided on review, and addressed the issues raised in the

review letter.  The final decision explains that Mayes exhausted her right to one independent

review under the terms of the Policy, but invited Mayes to submit any additional information

from Mayes' social security file that she would like for Standard to consider.  This lawsuit

followed on March 4, 2013.

---

[45]AR at 445.

[46]*Id.*

## III.    Discussion

In its motion for summary judgment, Standard argues that its decision was not arbitrary and capricious, citing the medical record, and arguing that it was not erroneous for Standard not to defer to Dr. Schnick's opinion that Mayes is disabled.  Plaintiff advances several arguments in her motion for summary judgment: (1) Standard changed its reason for denying her claim between the initial denial and the denial on review; (2) Standard failed to sufficiently investigate Mayes' eligibility for benefits; (3) Standard selectively reviewed the evidence, therefore, its decision cannot be based on substantial evidence, and (4) the administrative record supports Mayes' claim for benefits.  The Court addresses the reasons cited by Standard for its denial and Mayes' challenges to Standard's investigation and review of the administrative record.  The Court concludes that substantial evidence in the record, when evaluated against the backdrop of the administrative record as a whole, supports Standard's denial of LTD benefits in this matter.

### A.    *Reasons Provided by Standard for the Denial*

ERISA requires plan administrators to provide claimants a reasonable opportunity for "a full and fair review" of the denial decision.[47]  Mayes argues that she was not provided this opportunity because Standard changed its reasons for the denial between the initial denial decision and the decision on review.  Mayes contends that because the vocational reviews differed between the first and second denial decisions, it was impossible for her to provide the necessary documentation to support her claim on review, making the claim a "moving target," and rendering Standard's decision arbitrary and capricious.

The initial denial decision identifies Mayes' Own Occupation as that of an Electronics

---

[47]29 U.S.C. § 1133(2).

Engineer, which as performed in the national economy requires light work.  The decision quotes

the DOT description of light work and, after summarizing its review of the medical evidence,

explains that Mayes' physical illness would not preclude her from performing full-time work in

her Own Occupation, i.e, light work.  The decision concludes that Mayes did not suffer

complications from either heart surgery and had concluded a reasonable period of recovery.  In

its review of the medical evidence, the decision acknowledges Dr. Schnick's notes that Mayes

suffered from diminished capacity from her heart procedure, but it noted that she has "not

received a mental status examination nor have you been referred for any neurocognitive

testing."[48]  In addition to explaining that it did not find medical evidence to support Mayes'

disability claim, it also explained that the Physician Consultant, Dr. Fuchs, reviewed the medical

evidence and did not find evidence that Mayes' medical issues preclude her from light work.

The initial decision explains the review process, including that if Mayes requests a

review, the person conducting the review may "consult with a medical professional with regard

to this claim.  The medical professional will be someone who was not previously consulted in

connection with this claim."[49]  The decision explains that if she seeks review, Mayes has the

right to submit additional information in support of her claim that she is unable to work as a

result of her medical condition after January 30, 2012.

Per Standard's instructions, Mayes submitted a lengthy written appeal of the decision and

additional evidence in support of her claim, including the transcribed statement of Dr. Schnick.

The appeal raised several challenges to the initial decision: that Standard disregarded the opinion

---

[48]AR at 389.

[49]AR at 390.

of her treating physician, Dr. Schnick, in making the initial determination; that the limitations imposed by her physicians prevent her from performing either her own occupation, or any occupation; that Standard failed to consider the severity of her condition, her multiple diagnoses in addition to her cardiac condition, and her multiple medications and the compounding effect they have on her ability to perform the duties of her occupation.  She continued to argue that she suffered diminished mental capacity since her heart surgeries and that the initial decision ignored that evidence.

The decision on appeal involved an independent review of the entire record, including the updated evidence.  A new vocational specialist considered the demands of Mayes' "Own Occupation," and a new physician conducted a review of the medical evidence.  Like the initial decision, Standard determined that Mayes' impairments do not rise to the level of severity to render her unable to perform her Own Occupation.  The lengthy decision considered all of the information presented on initial review, as well as the additional information submitted by Mayes on appeal.

While Mayes is correct that during the course of the review Standard changed its assessment of the physical demands of her occupation, the Court does not find that this changed the basis of Standard's original decision.  The decisions are consistent in finding that Mayes' limitations do not rise to the level of disability under the "Own Occupation" definition in the LTD Plan.  The initial decision discussed Mayes' medical conditions and found that they did not prohibit the Light Work of an Electronics Engineer.  But the first vocational specialist did not discuss the specific physical requirements of Mayes' job with anyone at CenturyLink.  The decision on review, in contrast, was based in part on the second vocational specialist's interview

with Mayes' employer, which explained the actual duties of Mayes' job.  The employer relayed

that Mayes performed her work while sitting at a computer and working remotely with field

technicians who managed the physical aspects of the job.  This was part and parcel of Standard's

independent review.  Because Mayes' actual job duties did not require standing or walking

except to go on break, the vocational specialist classified it as sedentary in nature, or a type of

light work that did not involve frequent standing and walking.  Plaintiff sought and received an

independent review, which included a fresh vocational specialist, who considered more specific

evidence in determining the functional requirements of Mayes' job.

Moreover, the decision on review explains that the medical evidence does not support "a

level of impairment due to any one or more of Ms. Mayes' medical conditions that would have

prevented her from performing full-time sedentary *or* light level work beyond the end of the 180-

day Benefit Waiting Period."[50]  This decision is consistent with the initial denial—the reviewers

did not find that her impairments prevented her from either sedentary or light work.   It was not

arbitrary or capricious for Standard to make further findings on the functional requirements of

Mayes' job.

Mayes contends that the decisions are a moving target.  But her reliance on *Holmstrom v.*

*Metropolitan Life Insurance Co.*[51] for this proposition is misplaced.  The court in *Holmstrom*

explained that an insurer's decision is arbitrary and capricious where it invites additional

evidence to establish disability, yet when provided with the requested evidence, finds that it was

not sufficient under new requirements or standards that had not been previously communicated

---

[50]AR at 803 (emphasis added).

[51]615 F.3d 758 (7th Cir. 2010).

to the insured.[52]  In that case, the Court found that the insurer "moved the target" by rejecting the insured's cognitive testing and functional capacity evaluation after making general requests for them, on the basis that they failed to meet new requirements not previously disclosed.[53]  The court also found arbitrary and capricious the insurer's decision to discount medical evidence produced after the termination of benefits, despite the fact that it requested the insured undergo testing that by definition would take place after the cutoff.[54]

Here, the initial denial letter invited Mayes to submit evidence in support of her claim of cognitive impairments—it mentioned the lack of a sleep study, and the lack of a mental status examination or neurocognitive testing.  On appeal, Mayes presented the results of a sleep study but did not submit results or records about any other cognitive testing.  Unlike the plaintiff in *Holmstrom*, Mayes did not accept the insurer's invitation to submit cognitive test results in support of her claim that she suffered from diminished cognitive capacity.  While Mayes did submit the results of the sleep study, the decision on review did not apply a new requirement or standard in rejecting this evidence; it simply observed that the results did not show a significant enough impairment to allow a finding of disability under the terms of the Plan.  The Court does not find this to be arbitrary and capricious decision-making; instead, the two decisions are consistent and reasonable applications of the language in the LTD Plan to the medical evidence in the record both at the time of the initial determination, and on review.

**B.     *Standard's Review of the Medical Evidence***

---

[52]*Id.* at 775–76.

[53]*Id.* at 776.

[54]*Id.*

Mayes argues that Standard's decision was arbitrary and capricious because it failed to properly investigate her claim for LTD benefits and selectively reviewed the medical evidence. Specifically, she argues that Standard ignored its own reviewer's recommendations to obtain more information regarding her medical status, that it discounted medical opinions in support of Mayes' claim of disability, that it failed to consider the combination of Mayes' conditions, that it failed to consider the side effects of Mayes' medications, and that it improperly discounted the opinions of her treating physicians.

### 1.    Obligation to Obtain More Evidence

Mayes complains that the record includes recommendations from the nurse and physician reviewers that additional documentation is needed to support certain claims of impairments.  She points to Cazee's February 2012 review, where she identified several areas that required additional medical records to support the impairment claim; Dr. Fuch's March 2012 review recommending neurocognitive testing, and Dr. Green's review that cited a lack of "physical exam," cognitive testing or other diagnostic studies.  First, the Court notes that "nothing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists."[55]  But the Court must also look to the Plan itself to determine the standards that apply to the duty to investigate the claim.[56]  The Proof of Loss provision of the LTD Plan requires the claimant to provide Standard with written Proof of Loss that she is disabled and entitled to benefits at the claimant's expense.[57]

---

[55]*Holt v. Cont'l Cas. Co.*, 379 F. Supp. 2d 1157, 1175 (D. Kan. 2005) (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 804 (10th Cir. 2004)).

[56]*Gaither*, 394 F.3d at 804.

[57]AR at 498.

"Completed claims statements, a signed authorization for us to obtain information, and any other items we may reasonably require in support of a claim must be submitted at your expense."[58]

While the Court observes that the Plan does provide the administrator with discretion to require a claimant to submit certain evidence in support of a claim, Mayes is unable to point this Court to any additional medical evidence she could have mustered to support her claimed impairments in this case.  There is no indication that Standard did not request documentation from all of her many physicians, or that medical evidence exists to support her claim that was not requested.  Going back to the initial decision, it explained that neither Mayes' back problems nor her cardiac condition were severe enough to preclude her from working in her Own Occupation after the waiting period expired.  The decision did note that perhaps the claim in Dr. Schnick's January 7, 2012 treatment note about Mayes' cognitive impairment could prohibit her from light work, and noted that further testing might support this.  The decision invited Mayes to submit such evidence if she decided to seek an independent review.

Mayes contends that both Dr. Fuchs and Dr. Green note Mayes' complaints of cognitive defects "throughout their reviews."  This is a misleading characterization of these reviews.  To be sure, several physicians noted her complaints of fatigue, but only Dr. Schnick discussed cognitive impairments which she surmised were tied to loss of oxygen during the heart surgery.  And Dr. Schnick's statements rely on Mayes' subjective complaints of decreased mental capacity.  Standard encouraged Mayes to produce more evidence on review to support her claim of cognitive impairment; specifically, objective medical evidence in support of that claim.  On review, Mayes did undergo a sleep study, however, she did not submit any other diagnostic

---

[58]AR at 499.

records that might substantiate Dr. Schnick's note about mental impairment.  Instead, Mayes

relied on Dr. Schnick's telephonic statement where she reiterated her treatment note that Mayes

complained of diminished mental capacity since her heart surgeries, and that she suffered from

insomnia.  Dr. Schnick suggested that much of the cognitive decline was due to Mayes'

insomnia, explaining how concerned Mayes' husband had been about that issue.

The Court cannot find that Standard's decision was arbitrary and capricious for not

requesting additional medical evidence.  It is true that "fiduciaries cannot shut their eyes to

readily available information when the evidence in the record suggests that the information

might confirm the beneficiary's theory of entitlement *and* when they have little or no evidence in

the record to refute that theory."[59]  But here, Standard addressed Mayes' assertion of a mental

impairment and found that it was not supported by evidence in the record; evidence that it

invited Mayes to submit on review.  Its decision was based on much more than a scintilla of

evidence.  The record supports Mayes' claim of insomnia; the objective medical evidence

substantiates that she suffers from mild sleep apnea, which is treatable.  No further objective

evidence of cognitive impairment was presented by Mayes and it was not arbitrary and

capricious for Standard not to specifically request further evidence of such impairment.  Mayes'

argument appears to conflate Standard's review of the medical evidence in the record, finding it

does not support her disability claim, with the duty to seek additional evidence to substantiate

Mayes' claim.  As stated, the insurer does not have an affirmative duty under ERISA to seek out

evidence to support a claim of disability under these circumstances and the Plan here does not

impose any heightened requirement.  Given the length and detail in both denial decisions, Mayes

---

[59]*Benson v. Hartford Life & Acc. Ins. Co.*, 511 F. App'x 680, 685–86 (10th Cir. 2013).

was fully armed with the notice required under ERISA in order to challenge the decision on review, and appeal to this Court.[60]

### 2.    Consideration of Certain Medical Evidence

Next, Mayes points to medical evidence that she contends should have been given more weight in the final decision—Dr. Green's opinion that Mayes was precluded from performing certain light work, the co-morbidity of her multiple conditions, and the side effects of her medications.  The Court finds these challenges unavailing.  First, Mayes' contention that Dr. Green determined that she was "totally disabled" is not an accurate statement of the record.  Dr. Green did not make such a finding.  Furthermore, Standard did not omit Dr. Green's conclusion about her functional capacity in its final decision.  The final decision stated that the consulting internist found that the medical records do not support impairments that would prevent her from performing sedentary or *light level work that does not require frequent standing and walking*.  Dr. Green explicitly concluded that Mayes would be precluded from performing *light level work that requires frequent standing and walking*.  These conclusions are entirely consistent.

Standard also considered the myriad impairments included in the medical record to determine if she was disabled as defined in the Plan.  The decisions discuss her back problems, cardiac issues, diabetes, Lyme Disease, surgical procedures, depression, insomnia, and diminished cognitive abilities.  Mayes' contention that Standard's decision hinged on Nurse Cazee's review, which only addressed her cardiac condition, is not supported by the record.  The record reflects that Dr. Fuchs reviewed the medical records after Nurse Cazee's review, and that he interviewed Dr. Schnick.  Dr. Green preformed an independent review of the medical

---

[60]*See* 29 C.F.R. § 2560.503-1(g).

evidence, as supplemented, before the final decision was issued, including evidence obtained long after Cazee's review.

Mayes complains that Dr. Fuchs' communication with Dr. Schnick was incomplete, but this too is unsupported by the record. First, Dr. Schnick signed a statement sent by Dr. Fuch's that summarized her statements during this phone call, affirming that it was an accurate representation of their conversation. There is no evidence that she attempted to correct or clarify any of her statements to him during that initial review. Moreover, on appeal, Mayes submitted what is essentially an ex parte deposition of Dr. Schnick, which Standard considered and addressed in its final decision.

Finally, Mayes' contention that Standard failed to consider the side effects of her many medications is unavailing. Again, the record does not support this characterization of Standard's decision. In Mayes' appeal letter, her attorney listed all of her medications and then generically listed potential side effects. Standard's final decision addressed this argument and found that the evidence did not support that this claimant suffered from the side effects discussed: "we understand that many medications may have side effects. . . . Therefore, in evaluating any possible functional impairment resulting from medication side effects, we look at the claimant's medical records for documentation of subjective reports or clinical observations."[61]

To be sure, the evidence supports Mayes' claim that she was on an extensive medication regimen for her many medical issues, but as Standard explained, the administrative record does not support her contention that she suffered from side effects that impaired her ability to work. The only evidence in the record along these lines involved the medication prescribed for her

---

[61]AR at 794.

insomnia.  As Dr. Green observed, Mayes described side effects to Dr. Schnick associated with one of her sleep aid medications, at which point it was discontinued and a new medication was prescribed.  Standard determined that while Mayes may have established that the many medications she was prescribed have potential side effects, she did not support with medical evidence that she in fact suffered from those side effects.  This conclusion is supported by more than a scintilla of evidence and the Court declines to find it was arbitrary and capricious.

### 3.     Deference to Treating Physicians' Opinions

Mayes contends that Standard ignored the opinions of her treating physicians that she is disabled when it denied her LTD claim.  Mayes argues that she does not contend that Standard should have deferred to her treating physicians, instead, she argues that Standard ignored them entirely.  The Court does not find this to be an accurate representation of Standard's decision denying benefits.  It is clear from a review of both the initial denial decision and the final denial decision, that Standard reviewed the medical evidence submitted by Mayes' treating physicians. The fact that it interprets them differently than Mayes is not the same thing as ignoring them, as she contends.  Mayes generally argues that they "consistently reported that Mayes has remained totally unable to return to work in any capacity."  But in discussing the specific medical records, Mayes points to records of her complaints to physicians of pain, fatigue, memory loss, numbness, weakness and chest pain.  The denial decisions discussed these reports in detail and Mayes points the Court to no medical evidence in the record speaking to her functional capacity to perform her job as a result of these issues, other than those of Dr. Schnick.

After considering Dr. Schnick's treatment notes and her sworn statement, Standard concluded that her opinion on disability was not determinative.  "It is well settled that ERISA

does not require plan administrators to 'accord special deference to the opinions of treating physicians,' nor does it place 'a heightened burden of explanation on administrators when they reject a treating physician's opinion.'"[62]  The final decision spends approximately two pages addressing Dr. Schnick's sworn statement; it did not ignore her opinion.  Instead, Standard concluded that Dr. Schnick's assessment was based primarily on Mayes' subjective complaints and not on objective medical data; it could not corroborate her opinions on any of Mayes' health conditions with the specialists' records or other objective tests.[63]  Standard explained that "[w]hile we have considered and appreciate Dr. Schnick's comments, we do not find that Dr. Schnick's statement provides a persuasive rationale for concluding that Ms. Mayes' [sic] remained Disabled beyond the end of the Benefit Waiting Period."[64]  It was not arbitrary and capricious for Standard not to credit Dr. Schnick's opinion that Mayes was disabled.

The Court further finds that, contrary to Mayes' contention, Standard did consider and weigh her other treating physicians' opinions.  Both of Standard's written decisions relied on physician consultants who reviewed all of the medical evidence and attempted to synthesize the many physicians' recommendations and treatments for her myriad medical conditions.  These reviewing physicians could not identify any other treating physician record that supported a finding of disability other than Dr. Schnick.  Indeed, Mayes points this Court to no other treating physician opinion in the record stating that Mayes was precluded from performing her job after

---

[62]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1189 (D. Kan. 2010) (citing *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325 (10th Cir. 2009) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003))).

[63]*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999).

[64]AR at 802.

January 30, 2012.  Based on their review of the medical records, both consulting physicians determined that Mayes could perform the functions of her occupation and Plaintiff pointed Standard to no other physician opinion other than Dr. Schnick that controverted these determinations.

There is no dispute that Mayes suffers from several serious medical issues, for which she was prescribed numerous medications.  However, Plaintiff failed to present objective medical evidence of the degree of her fatigue, pain, or cognitive impairment that would allow this Court to determine that Standard's decision was not supported by substantial evidence.  There is no abuse of discretion in denying benefits to a claimant who failed to present "reasonable medical evidence concerning the severity of her condition or how it affected her ability to work."[65]

### C.      Standard's Review of the Vocational Evidence

Mayes argues that Standard erred by failing to conduct a vocational assessment to determine Mayes' employability or ability to work, and based on her actual job duties.  She argues that Standard evaluated her functional capabilities such as sitting and standing, rather than her ability to perform the material duties of her Own Occupation.  Under the Plan, disability is defined in this context as being unable to perform the "material duties" of her Own Occupation.  "Material Duties" under the Plan

> means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.  In no event will we consider working an average of more than 40 hours per week to be a Material Duty.[66]

---

[65]*Gilbertson v. Alliedsignal, Inc.*, 172 F. App'x 857, 861 (10th Cir. 2006).

[66]AR at 487.

Mayes contends that Standard never inquired into the requirements of her job and instead focused on what is not required—standing and walking.  Mayes further argues that Standard did not take into account her non-exertional limitations—cognition, stamina, fatigue, and ability to handle stress.

The Court finds that Standard's assessment of the material duties of Mayes' Own Occupation, as defined in the Plan, was not arbitrary and capricious.  As already discussed in detail, Standard considered several sources of evidence in determining the material duties of her occupation as an Electronics Engineer, and relied on the DOT definitions, as well as the employer's description of that job in determining whether Mayes' limitations precluded her from working.  Moreover, as already described, Standard concluded that there was not sufficient evidence in the record to support Mayes' claim of non-exertional impairments, so to the extent she claims that her fatigue and cognitive limitations precluded her from working, the Court had already found that Standard's determination was supported by substantial evidence.

### D.      Social Security Determination

Mayes challenges Standard's decision because it did not give weight to her disability benefits award by the Social Security Administration ("SSA").  Mayes concedes however, that an award of disability benefits does not dictate a finding of LTD benefits in this case, as there are "critical differences between the Social Security disability program and ERISA benefit plans."[67] Here, Standard found that the SSA award letter was not persuasive evidence of disability because it was an initial award letter that contained no explicit findings.  Of course, in order to be awarded disability benefits, the SSA had to find that Mayes was entitled to those benefits.  A

---

[67] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

social security applicant "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[68]

But Standard explained in its final denial letter that the SSA did not issue a written decision with factual findings, therefore there is no indication that the SSA found that Mayes suffers from a level of impairment that precludes full-time sedentary work, or light work that does not require frequent standing or walking beyond January 30, 2012.  Likewise, there is no indication in the record as to the particular impairment or impairments that the SSA found severe enough to preclude Mayes' work.  Moreover, unlike under the Social Security scheme, here the plan administrator need not give controlling weight to a treating physician's opinion over the opinion of a consulting physician.[69]  Given the lack of information about the basis of the SSA's decision, it was not arbitrary and capricious for Standard to afford it little weight.

IV.   **Conclusion**

In sum, the Court finds that even giving some limited weight to Standard's conflict of interest in this matter, its decision denying Mayes' LTD benefits was not arbitrary and capricious, and was supported by substantial evidence in the administrative record.  Much of Mayes' challenge before this Court centers around her contention that Standard had an affirmative duty to harness further evidence in support of her disability claim.  While Mayes is correct that in certain circumstances the fiduciary has such a duty, it is not the sweeping rule that

---

[68]42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[69]*See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

she represents in her appeal.  *Gaither* did not hold that "the administrator must pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence."[70]  Here, Standard reviewed the administrative record, rendered a detailed decision, and allowed Mayes a full and fair opportunity for an independent review.  After considering additional evidence and argument from Mayes, Standard reconsidered but ultimately upheld its original denial decision.  The investigation did not violate ERISA and its decision was not arbitrary and capricious.[71]  In upholding Standard's denial of LTD benefits, the Court makes no finding as to whether Standard's was the best, or "superlative" decision; rather, the Court concludes that Standard's decision was made in good faith and on a reasoned basis.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant The Standard Insurance Company's Motion for Summary Judgment (Doc. 32) is **granted**; Plaintiff Jody Mayes' Motion for Summary Judgment (Doc. 35) is **denied**.

**IT IS SO ORDERED**.

Dated: September 24, 2014

        S/ Julie A. Robinson       
        JULIE A. ROBINSON
        UNITED STATES DISTRICT JUDGE

---

[70] *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004).

[71] *See Benson v. Hartford Life & Acc. Ins. Co.*, 511 F. App'x 680, 686 (10th Cir. 2013).